UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HELEN Y. MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 4216 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| OFFICE OF THE CHIEF JUDGE OF CIRCUIT | ) | |
| COURT OF COOK COUNTY OFFICIAL COURT | ) | |
| REPORTERS OFFICE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Helen Miller sued her former employer, Office of the Chief Judge of Circuit Court of

Cook County Official Court Reporters Office ("OCJ"), alleging that it subjected her to a hostile

work environment and retaliated against her for reporting sexual harassment, in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and failed to accommodate and

fired her due to her disability, in violation of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 *et seq.* Doc. 1. (The complaint's claims under the Family Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 *et seq.*, and request for punitive damages were dismissed by

agreement early in the litigation. Doc. 24.) With discovery complete, OCJ moves for summary

judgment. Doc. 81. The motion is granted in part and denied in part.

### Background

The court recites the facts as favorably to Miller as the record and Local Rule 56.1

permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At

this juncture, the court must assume the truth of those facts, but does not vouch for them. *See*

*Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A.    Alleged Sexual Harassment

Miller worked for OCJ as an official court reporter in the Cook County courthouse in Skokie, Illinois, from 2007 through June 2018. Doc. 92 at ¶ 4. As a court reporter, Miller recorded court proceedings in various courtrooms on a rotating basis. *Id*. at ¶ 5.

According to her direct supervisor, Nancy Naleway, Miller did her job well, acted like a professional, was respectful, and always followed office directives. *Id*. at ¶¶ 8-9; Doc. 104 at ¶ 2. Naleway in fact encouraged Miller to apply for a supervisor role due to her demonstrated leadership qualities. Doc. 104 at ¶ 2. Marilyn Filishio, Director of the State of Illinois Official Court Reporters—to whom Naleway reported—described Miller as a "great court reporter" about whom she had never heard any complaints. *Ibid*.; Doc. 92 at ¶¶ 8-9. Judges, judges' staff, attorneys, and colleagues with whom Miller worked noted her positive attitude, strong work ethic, and ability to get along with others. Doc. 104 at ¶ 3.

Steve Valenza and Miles Cooperman worked as Cook County Sheriff's deputies at the Skokie courthouse. *Id*. at ¶ 5. Beginning around 2011 or 2012, Valenza began making highly inappropriate statements to Miller, including: "I'm going to fuck you until you leak"; "I'm going to fuck you until you can't walk"; "I should stop having anal sex with my wife so she could get pregnant"; and "you don't know what I could do to you." *Id*. at ¶ 6. At around the same time, Valenza and Cooperman started commenting on Miller's clothes, weight, and appearance; encroaching on her personal space; leering and snickering at her; taking pictures of her without her consent; bowing to her because she is Asian; grabbing her microphone as though it were a penis; and following her into hallways. *Ibid*.

On April 27, 2018, Valenza and Cooperman entered Miller's assigned courtroom and surrounded her, with one standing behind her and the other in front. *Id*. at ¶ 7. Cooperman placed two fingers in front of his mouth and wagged his tongue between them, a gesture

indicating "oral sex on a woman's vagina," and Valenza smirked in response. *Ibid*. Miller ran out of the courtroom crying. *Ibid*.

Miller reported the incident to Naleway that day. Doc. 92 at ¶ 16. Naleway called Jeanine LaMantia-Potter, the Executive Assistant for the State of Illinois Official Court Reporters, and gave the phone to Miller to describe what happened. *Id*. at ¶¶ 10, 19. LaMantia-Potter in turn reported the incident to her supervisor, Filishio, and to the Human Resources Administrator, Laura Kelly. *Id*. at ¶¶ 10, 12, 20; Doc. 104 at ¶ 8. Also that day, Naleway removed Miller from the regular rotation of court reporters and assigned her to the courthouse's second floor. Doc. 92 at ¶ 21. Naleway knew that Valenza and Cooperman were "mostly" assigned to the first floor and believed that assigning Miller to the second floor would prevent her from encountering them. *Ibid*. Miller worked exclusively on the second floor starting the following business day. *Ibid*.

### B. OCJ's Response to Miller's Complaint

OCJ's Administrative Regulations for Court Reporting Services in the Illinois Courts include a sexual harassment policy that outlines the procedures to be taken in response to a complaint of sexual harassment. *Id*. at ¶ 24; Doc. 104 at ¶ 11. The procedures include reporting the complaint to the Chief Judge within seven days, promptly initiating an investigation of the complaint, preparing a written summary of the investigation's findings, reporting the findings to the alleged harasser's supervisor, and notifying the victim of the investigation's results and any discipline imposed. Doc. 104 at ¶ 15. In addition, when the alleged harasser is a non-employee, the policy requires the "appropriate judicial or supervisory personnel [to] communicate the alleged conduct to the offending person and/or his or her employer. They shall be informed that the offensive conduct will not be tolerated and that steps must be taken to assure such actions do not occur again." *Id*. at ¶ 12. OCJ does not employ Cook County Sheriff's Office staff,

3

including Valenza and Cooperman, and has no control over their work schedules or assignments at the courthouse. Doc. 92 at ¶ 22.

On May 2, 2018, days after the incident, LaMantia-Potter interviewed other official court reporters at the Skokie courthouse "to determine if [they] believed they had been sexually harassed" by Valenza and Cooperman. *Id*. at ¶ 26; Doc. 104 at ¶ 17. OCJ did not inform Valenza or Cooperman, or the Sheriff's Office, of Miller's complaint. Doc. 104 at ¶ 13. Nor did OCJ report the complaint to the Chief Judge, conduct an investigation to determine what happened on April 27, prepare a written summary of the investigation's findings, report the investigation's findings to Cooperman and Valenza's supervisor, or notify Miller of the investigation's results. *Id*. at ¶ 16. LaMantia-Potter admits that she "did not conduct an investigation to obtain a true and complete account of [Miller's] claims." *Id*. at ¶ 17. Naleway, LaMantia-Potter, Kelly, and Filishio admit that Cooperman's and Valenza's alleged behavior violated OCJ's sexual harassment policy. *Id*. at ¶ 4.

On May 3, four days after Miller started working exclusively on the second floor, Cooperman walked through her assigned courtroom. *Id*. at ¶ 27. Miller "was in shock" and started shaking and crying uncontrollably. *Id*. at ¶ 28. When the judge took a break, Miller left the courtroom. *Ibid*. Naleway found Miller sobbing in the chambers of another judge, expressed concern that she had shared details about the harassment with the judge, and told her that she should not discuss the harassment with anyone else. *Id*. at ¶ 29. LaMantia-Potter considered Miller sobbing in the judge's office to be a "disruption" and "inappropriate in a courtroom setting." *Ibid*.

On May 4, LaMantia-Potter provided Miller with a Sheriff's Office complaint form and told her that OCJ would submit the completed form to the Sheriff's Office. *Id*. at ¶ 18. That day,

Miller completed the form, in which she described Cooperman's and Valenza's harassment, and faxed it to LaMantia-Potter, who sent it to Kelly. Doc. 92 at ¶ 27. On May 11, LaMantia-Potter told Miller that the Sheriff's Office needed an original copy of the complaint form, not a fax, and asked Miller to send her the original via interoffice mail. *Id*. at ¶ 28.

On May 14, Miller discussed with Naleway the possibility of temporarily moving to another courthouse. *Id*. ¶ 29. On May 15, Filishio and LaMantia-Potter called Miller and offered her a temporary relocation to the Rolling Meadows courthouse. *Id*. at ¶ 30. Miller told them that she was no longer interested in transferring and felt that, as the victim of sexual harassment, she "shouldn't be the one that should have to upend her work life." Doc. 104 at ¶ 30. Miller became very upset, prompting Filishio to tell her that she was "too emotional," that the temporary transfer was "not her [Miller's] choice," and that "[y]ou are [going]." *Id*. at ¶ 31. Filishio believed that Miller's reaction to the harassment was disruptive, telling her, "You are disrupting my courthouse." *Ibid*.

Miller then asked Filishio whether her complaint form had been submitted to the Sheriff's Office. *Id*. at ¶ 20. Filishio responded that it was "not her responsibility" to submit the form, although she did not in fact know whether it was OCJ's responsibility, and LaMantia-Potter told Miller that she could "print up [the] papers and file them herself." *Ibid*. Filishio eventually ended the call because Miller was yelling in an open office. *Id*. at ¶ 33. Filishio called back and was told that Miller was under her desk and refused to come to the phone. *Ibid*. When Miller came to the phone, Filishio ordered her to report for a meeting downtown the following day, informing her that it was a "direct order," which she could be fired for violating. *Ibid*.

Later that day, Miller called the Sheriff's Office to inquire about the status of her complaint; after the call, she faxed her complaint form to the Sheriff's Office. *Id*. at ¶ 19. Two days later, on May 17, the Sheriff's Office notified Miller that an investigator had been assigned to her complaint. Doc. 92 at ¶ 35.

On May 16, Miller met downtown with Filishio and LaMantia-Potter, who again offered her a temporary relocation to the Rolling Meadows courthouse. *Id*. at ¶ 32; Doc. 104 at ¶ 34. Miller said that she wanted to remain at the Skokie courthouse on the second floor, to which LaMantia-Potter responded that she needed to act professionally and that it was "not appropriate to have outbursts in court." Doc. 104 at ¶ 34. Filishio told Miller that her "complaint goes to [the] sheriff, we are out of it." *Id*. at ¶ 21. Later that day, LaMantia-Potter informed Miller that she had received the original copy of her complaint form and would "retain" it because Miller had already submitted her complaint to the Sheriff's Office. Doc. 92 at ¶ 34.

On May 17, Cooperman again walked through Miller's assigned courtroom, which upset her. Doc. 104 at ¶ 35. Another court reporter told Naleway that Miller was upset and was delaying proceedings. *Ibid*. Naleway called Filishio, who was in a meeting with LaMantia-Potter and Katherine Verrant, OCJ's Labor and Employment Counsel, and told them what she had heard. Doc. 92 at ¶ 11; Doc. 104 at ¶ 36. Verrant told Naleway that "perhaps [Miller] should be removed from the office effective the following day if these outbursts were going to continue." Doc. 104 at ¶ 36. And Verrant suggested to Filishio and LaMantia-Potter that "we find a way to remove [Miller] from the situation immediately" given that she was "upset and was possibly unable to continue performing her job duties," and proposed suspending Miller under Section 13.6 of her collective bargaining agreement ("CBA"), which permits suspension when "the Employer believes that the presence of an employee is dangerous or may result in the

disruption of operations, or when the employee's alleged actions may result in violation of the rules of professional conduct and/or code of conduct referenced in the Employer's policy and procedure manual." *Id*. at ¶ 37. (Miller was a member of the Local Union No. 134, International Brotherhood of Electrical Workers, AFL-CIO, which had entered into the CBA with OCJ. Doc. 92 at ¶ 6.).

After the call, Naleway and LaMantia-Potter spoke to Miller—and to the court reporter who had contacted Naleway—and determined that Miller had not delayed court proceedings. Doc. 104 at ¶ 38. Later that day, LaMantia-Potter directed Naleway to ask the other court reporters who had been in the office when Miller was on the phone with Filishio and LaMantia-Potter on May 15 to submit written statements to LaMantia-Potter describing Miller's conduct during and immediately after that call. *Id*. at ¶ 39.

On May 21, Valenza and Cooperman were temporarily removed from the Skokie courthouse, and Miller returned to her normal rotating schedule the next day. Doc. 92 at ¶¶ 36-37.

### C. Leave of Absence and Termination

On June 4, Miller applied for a three-month unpaid FMLA leave of absence. Doc. 104 at ¶ 41. Her application included a statement from her physician identifying the "Nature of Disability or Illness" as "PTSD from sexual harassment at work and continued lack of support in her office." Doc. 92 at ¶ 42; Doc. 104 at ¶ 40. That was the first time Miller notified OCJ that she had been diagnosed with PTSD. Doc. 92 at ¶ 43. According to the physician's statement, Miller's symptoms included "stomach twisting, heart racing, crying, difficulty sleeping, anxiety [and] panic," Doc. 104 at ¶ 40; at her deposition, Miller described her symptoms as including "[p]anic, sleeplessness, tearfulness, inability to concentrate, inability to be in the City of Skokie or surrounding cities, inability to see a sheriff's car, a sheriff's uniform, fear of sheriffs in other

7

courthouses, emptiness, [and] desertion," Doc. 84-8 at 1.  Miller began her leave on June 5, and

Filishio approved her FMLA leave request on June 7.  Doc. 92 at ¶ 40; Doc. 104 at ¶ 41.  While

on leave, Miller remained an OCJ employee.  Doc. 92 at ¶ 41.

On June 15, LaMantia-Potter sent an email to Kelly and Verrant reporting that Miller had

"enter[ed] the Skokie courthouse Friday, June 8, 2018, after business hours and cleared out her

desk without clearance to remove items from the building or notice to her supervisor."  Doc. 104

at ¶ 43; Doc. 94-17 at 2.  LaMantia-Potter's email forwarded a social media post by Miller

stating that she was treated as a "burden" by her employer and subjected to a "hostile,

unsupportive, cold, unwelcoming environment."  Doc. 104 at ¶ 43; Doc. 94-17 at 5.  Verrant

responded that OCJ did not need to take action on Miller's social media posts "at this point" and

advised LaMantia-Potter that, "if [she] would like to," she could tell Miller to contact a

supervisor if she had to enter the building while on leave.  Doc. 104 at ¶ 43; Doc. 94-18 at 2.  As

Director of Human Resources, Kelly was not involved in the "lower levels of discipline," but she

was brought in when the recommended discipline was termination, on which she had authority to

act.  Doc. 104 at ¶ 44.

On June 12, Miller applied to provide court reporting services for Esquire Deposition

Solutions, a private company.  Doc. 92 at ¶ 44.  Section O of the Administrative Regulations sets

forth OCJ's secondary employment policy, the purpose of which is to avoid conflicts of interest.

Doc. 104 at ¶ 55.  Section O(1), titled "Private Reporting Work Prohibited," states in relevant

part:

> Court reporting services employees may not engage in private reporting
> employment.  Court reporting services employees are prohibited from being
> partners, associates, or employees of any reporting firm or corporation, and
> they may not receive any payments or fees for transcripts or appearances paid
> for reporting work done by another court reporter.

Doc. 92 at ¶ 56. Section O(2), titled "Secondary (Non-Reporting) Employment," allows employees to engage in secondary employment if the secondary employment does not pose an actual or potential conflict of interest with the employee's OCR job and the employee's supervisor is notified prior to the employee accepting the secondary employment. Doc. 104 at ¶ 55. Section O(2) provides further that, "[i]f an employee accepts a position without notifying his or her employer or accepts a position which poses an actual or potential conflict of interest, the employee may be subject to disciplinary action, up to and including termination." *Ibid*.

Section 13.4 of the CBA provides that, "[p]rior to the imposition of suspension or discharge, [OCJ] shall convene a pre-disciplinary meeting," at which OCJ "shall meet with the employee to discuss the circumstances giving rise to the contemplated discipline," and that OCJ must "afford the employee an opportunity to rebut any evidence or charges against him/her." *Id*. at ¶ 50. The employee is entitled to have a union representative present at the pre-disciplinary meeting. *Ibid*.

On June 18, OCJ received a copy of Miller's Esquire Deposition Solutions application and related documents, which Miller had included (likely accidentally) in a packet of transcripts that she sent to Naleway. Doc. 92 at ¶ 46. On June 19, Miller performed a court reporting assignment for Esquire. *Id*. at ¶ 45. That day, Naleway faxed Miller's Esquire documents to LaMantia-Potter. *Id*. at ¶ 47. LaMantia-Potter notified Kelly and Verrant, and Kelly directed Verrant to work with LaMantia-Potter to prepare a report and recommendation. Doc. 104 at ¶¶ 48-49. LaMantia-Potter told Filishio that she intended to terminate Miller if it was verified that Miller had violated the secondary employment policy, and Filishio agreed. *Id*. at ¶ 46.

Verrant contacted Esquire to ask whether Miller was employed there as a court reporter. Doc. 92 at ¶¶ 50-51. In response, Esquire faxed Verrant a copy of Miller's "Esquire Service

Partner Profile Details" form, which had been included in the packet that Naleway received on June 18. *Id*. at ¶ 52. And Esquire confirmed to Verrant that "Service Partners" were court reporters who provide paid contract services to Esquire. *Id*. at ¶¶ 53-54. Verrant sent LaMantia-Potter and Kelly her correspondence with Esquire, suggested that Miller had "terminated her own employment with [OCJ] by choosing a different job," and proposed that "[w]e can discuss how to phrase this so as not to be disciplinary." *Id*. at ¶ 55; Doc. 104 at ¶ 48.

Verrant, Filishio, Kelly, and LaMantia-Potter discussed the results of Verrant's investigation into Miller's relationship with Esquire and decided to terminate her without considering any other form of discipline or affording her a pre-disciplinary meeting. Doc. 104 at ¶ 49. No one at OCJ—including Verrant, LaMantia-Potter, Kelly, and Filishio—attempted to determine whether Miller had in fact accepted any assignments from Esquire. *Id*. at ¶ 47. Nor did anyone at OCJ assess whether Miller's employment with Esquire created an actual or potential conflict of interest with her OCR employment. *Id*. at ¶ 48.

On June 20, OCJ sent Miller a termination letter stating that she was "immediately terminat[ed]" for having "accepted a position as a court reporter with a private reporting service," in violation of Section O of the Administrative Regulations. Doc. 92 at ¶ 61; Doc. 83-22 at 1. The termination letter quoted two passages from Section O: first, that "Court reporting services employees may not engage in private reporting employment" (Section O(1)); and second, that "[i]f an employee accepts a [secondary non-reporting employment] position without notifying his or her employer or accepts a position which poses an actual or potential conflict of interest, the employee may be subject to disciplinary action, up to and including termination" (Section O(2)). Doc. 92 at ¶ 61; Doc. 83-22 at 1.

Miller was the first OCJ court reporter to file a sexual harassment complaint. Doc. 104 at ¶ 51. Besides Miller, OCJ has terminated a court reporter or imposed discipline of a suspension or worse without a pre-disciplinary meeting only for "abandoning the[] job altogether." *Ibid.* Other instances in which OCJ disciplined court reporters include:

- A court reporter who failed to return from leave when scheduled was fired after being given multiple opportunities to return, afforded a pre-disciplinary meeting, and found to have abandoned his job. *Id.* at ¶ 66.

- A court reporter who failed to record the cross-examination of a witness and potions of a closing argument, but who nonetheless certified the transcript as true and accurate, and who had previously been instructed to use a tape recorder due to similar issues, was afforded a pre-disciplinary meeting and suspended for only three days. *Id.* at ¶ 67.

- Four court reporters who bullied and harassed other court reporters because of their race, tripped or shoved coworkers, or made inappropriate comments about oral sex, were afforded pre-disciplinary meetings, suspended for 10 to 30 days, and transferred to another courthouse. *Id.* at ¶¶ 68-71.

- A court reporter who had previously been suspended for taking unauthorized leave and stealing time violated a judge's order by failing to seal portions of a hearing transcript, prompting the judge to ask that she be removed from the case. *Id.* at ¶ 72. The court reporter was afforded a pre-disciplinary meeting and suspended for 20 days. *Ibid.*

- Four court reporters who falsified time sheets by leaving the office early, but who reported that they had worked the full workday, were afforded pre-disciplinary meetings and suspended for three to five days. *Id.* at ¶ 73.

- A court reporter was suspended three times—for three, six, and ten days—for "chronic tardiness"; suspended for twelve days for disregarding her supervisor's directive and staying in the office after hours; and transferred to the Rolling Meadows courthouse, with a six-month probationary period, for arriving late to work, failing to inform her supervisor that she was not coming to work, and failing to timely submit required paperwork after taking medical leave. *Id.* at ¶ 74.

Those disciplinary actions were approved by either Filishio or LaMantia-Potter. *Id.* at ¶ 64.

## Discussion

As noted, Miller brings Title VII hostile work environment and retaliation claims, and ADA failure to accommodate and discrimination claims.  Doc. 1 at ¶¶ 33-53, 75-83.

## I.      Title VII Claims

### A.      Hostile Work Environment Claim

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The provision protects against "the creation of a hostile work environment that is severe or pervasive enough to affect the terms and conditions of employment."  *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016) (internal quotation marks omitted).  To survive summary judgment on a sex-based hostile work environment claim, a plaintiff must adduce evidence sufficient for a reasonable jury to find "that she was: (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability."  *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) (internal quotation marks omitted).  Focusing solely on the fourth element, OCJ contends that it cannot be liable for Miller's sexual harassment by Cooperman and Valenza—who are not OCJ employees—because it took "prompt remedial action" to protect her from further harassment by moving her to the second floor of the Skokie courthouse and offering to transfer her to the Rolling Meadows courthouse.  Doc. 82 at 6-7; Doc. 102 at 13-14.

Under Title VII, "an employer is liable for the harassment of a nonemployee … if it was negligent either in discovering or remedying the harassment."  *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (internal quotation marks omitted); *see also Dunn v.*

*Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) ("An employer is responsible for … any [] discriminatory term or condition of employment that the employer fails to take reasonable care to prevent or redress. … Ability to 'control' the actor plays no role."). An employer is negligent in remedying harassment if "it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016) (internal quotation marks omitted); *see also Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011) ("Once aware of workplace harassment, the employer can avoid liability … if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.") (internal quotation marks omitted), *aff'd*, 570 U.S. 421 (2013); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 637 (7th Cir. 2009) ("Our focus, therefore, is on whether [the employer] responded promptly and effectively to the incident.").

A reasonable jury could find for Miller on the employer liability element of her claim because, viewing the facts in her favor, OCJ's response to her complaint about Cooperman and Valenza was apathetic and not reasonably likely to prevent the harassment from recurring. True enough, Naleway removed Miller from the regular court reporter rotation and assigned her exclusively to the second floor of the Skokie courthouse, starting one business day after her complaint, in an effort to distance her from Cooperman and Valenza, who worked "mostly" on the first floor. Doc. 92 at ¶ 21. But Cooperman and Valenza easily could and did find Miller on the second floor only four days after she started working there. Doc. 104 at ¶ 27.

Moreover, LaMantia-Potter provided Miller with a Sheriff's Office complaint form and told her that OCJ would submit it on her behalf. *Id*. at ¶ 18. Drawing all reasonable inferences in Miller's favor, however, OCJ either intentionally slow-walked or intended never to submit her complaint to the Sheriff's Office. A full week passed between LaMantia-Potter receiving

Miller's complaint and telling her that the Sheriff's Office needed an original copy, and by the time LaMantia-Potter received the original, Miller had already submitted a complaint to the Sheriff's Office herself. Doc. 92 at ¶¶ 27-28, 34. The fact that the Sheriff's Office opened an investigation two days after Miller faxed it a copy of her complaint, without ever receiving the original copy, suggests that LaMantia-Potter had no basis to tell Miller that the Sheriff's Office's needed the original complaint. *Id.* at ¶ 35; Doc. 104 at ¶ 19. Indeed, LaMantia-Potter and Filishio explicitly stated their disinterest in helping Miller submit her complaint to the Sheriff's Office, telling her that it was "not [Filishio's] responsibility" to do so (even though Filishio did not know if that was true) and that she could "print up [the] papers and file them herself." Doc. 104 at ¶ 20.

OCJ also failed to investigate whether Valenza and Cooperman had harassed Miller; instead, LaMantia-Potter interviewed *other* court reporters "to determine if [they] believed they had been sexually harassed" by the two deputies. Doc. 92 at ¶ 26; Doc. 104 at ¶¶ 16-17. Although "a prompt investigation is the hallmark of a reasonable corrective action," *Porter*, 576 F.3d at 636, an investigation of the alleged harassment of the *complainant* is required. *See Vance*, 646 F.3d at 471 (holding that the employer "satisfied its obligation under Title VII" in part by "promptly investigating each of *Vance's* complaints") (emphasis added); *Porter*, 576 F.3d at 636-39 (holding that the employer "took appropriate steps to bring the harassment to an end" by "investigating … the harassment of which it had knowledge"); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004) (holding that the employer was not liable under Title VII in part because it "conducted a prompt, thorough investigation into the incidents" reported by the plaintiff); *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000) (holding that the employer "responded promptly to [the employee's] harassment

14

complaint" by "beg[inning to] investigat[e] [the employee's] allegation on the day of the incident"). LaMantia-Potter admitted that she "did not conduct an investigation to obtain a true and complete account of [Miller's] claims." Doc. 104 at ¶ 17.

OCJ's failure to follow its own policies for responding to sexual harassment complaints further indicates that its response to Miller's complaint was half-hearted at best. Although the Administrative Regulations required OCJ to communicate alleged harassment to the harasser or his employer when the alleged harasser was a non-employee, OCJ failed to inform Cooperman, Valenza, or the Sheriff's Office of Miller's complaint. *Id*. at ¶¶ 12-13. It would have been easy enough for OCJ to contact the Sheriff's Office, and doing so could have immediately and meaningfully reduced the risk that the harassment would reoccur. OCJ also failed to report Miller's complaint to the Chief Judge, investigate the complaint itself, prepare a written summary of the investigation's findings, report the findings to Cooperman's and Valenza's supervisor, or notify Miller of the investigation's results, all of which were required by the Administrative Regulations. *Id*. at ¶ 15.

That OCJ offered to transfer Miller to the Rolling Meadows courthouse—fourteen miles and a half hour drive from the Skokie courthouse—does not warrant a different result. Viewed in the light most favorable to Miller, the evidence suggests that OCJ made that offer to avoid dealing with her complaint rather than to improve her working conditions. When Miller said that she did not want to "upend her work life" by transferring courthouses, Filishio responded that the transfer was "not her choice" and said, "[y]ou are [going]." *Id*. at ¶¶ 30-31. A reasonable jury could find that attempting to force an employee to transfer offices against her will in order to avoid her harassers is not "appropriate corrective action" in response to a complaint of sexual harassment, even if it is "reasonably likely to prevent the harassment from recurring." *Cole*, 838

15

F.3d at 898; *cf. Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059 (7th Cir. 1998) (holding that an ADA-covered employee's "allegation that he was forced to transfer to a new location and to work alone … is a clear claim of forced reassignment or of an unreasonable accommodation," in violation of the ADA).

Accordingly, Miller's Title VII hostile work environment claim survives summary judgment and will proceed to trial.

## B.     Retaliation Claim

Title VII's antiretaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord*, 839 F.3d at 563 (citing 42 U.S.C. § 2000e-3(a)).  "To establish a … retaliation [claim] under Title VII, [Miller] must show: (1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against [her], and (3) there is a causal link between the protected activity and the adverse action."  *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).  Miller's retaliation claim is predicated on her termination.  Doc. 91 at 16-22.  OCJ does not dispute that Miller's complaint about sexual harassment is protected activity, or that her termination was a materially adverse action; instead, it focuses on the causation element of her claim.  Doc. 92 at 7-9; Doc. 102 at 6-13.

Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII retaliation claim survives summary judgment if the plaintiff adduces evidence that, "considered as a whole," would allow a reasonable jury to find that her protected activity caused an adverse employment action.  *Id*. at 765.  Although a plaintiff may satisfy her burden using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628-29 (7th Cir. 2018) ("In *Ortiz*, … we left *McDonnell Douglas* burden-shifting as a viable option for pursing employment

discrimination claims."), Miller does not press that framework in her brief. *See Gates*, 916 F.3d at 641 ("The district court was not required to address a claim or theory that plaintiff did not assert [in opposition to summary judgment]."). Accordingly, the court, consistent with *Ortiz*, will "assess cumulatively all the evidence" on which Miller relies "to determine whether it permits a reasonable factfinder to determine" that her complaints about being sexually harassed caused her termination. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see also Swyear v. Fare Foods Corp.*, 911 F.3d 874, 883 (7th Cir. 2018) ("The parties have not framed their arguments using the *McDonnell Douglas* burden shifting framework, but rather have simply disputed whether sufficient evidence has been produced to support a jury verdict.").

"To prove causation, [Miller] must show that the desire to retaliate was the but-for cause of" her termination, meaning that the termination "would not have occurred in the absence of" her complaints. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (internal quotation marks omitted); *see also Mollet*, 926 F.3d at 897 (holding that the plaintiff must show that "the protected activity was *the* but-for cause of the adverse action," not merely "*a* but-for cause"). "In the Title VII retaliation context, causation can be established by," among other things, "a pretextual explanation for the [adverse action]." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018). "[P]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 850 F.3d 690, 698 (7th Cir. 2017) (alteration and internal quotation marks omitted); *see also Castro v. Devry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the

employer honestly believed the reason it has offered to explain the [adverse action].") (internal quotation marks omitted).

Miller contends that the true reason OCJ fired her was retaliation for her sexual harassment complaint, not any violation of the secondary employment policy, and she adduces sufficient evidence of pretext to preclude summary judgment. Doc. 91 at 16-22. As Miller tells it, following her complaint, OCJ viewed her as a disruption and began looking for ways to get rid of her, including by investigating her for trivial matters such as crying on the phone, entering the building without permission while on leave, and posting on social media about the harassment. Doc. 104 at ¶¶ 39, 43. Filishio and LaMantia-Potter both considered Miller's reaction to the harassment to be disruptive, with Filishio telling her, "You are disrupting my courthouse," and LaMantia-Potter reprimanding her that it was "not appropriate to have outbursts in court." *Id.* at ¶¶ 29, 31, 34; Doc. 83-8 at 58. OCJ attempted to force Miller to transfer to Rolling Meadows, with Filishio telling her, after she balked, that it was "not her choice" and "[y]ou are [going]." Doc. 104 at ¶¶ 30-31. And Verrant, Filishio, and LaMantia-Potter considered immediately removing Miller from the office and suspending her under the CBA due to an inaccurate report that she had delayed court proceedings after becoming upset when Cooperman walked through her courtroom. *Id.* at ¶¶ 35-38.

The speed, harshness, and procedural irregularities of OCJ's decision to fire Miller further suggest that its stated reason for terminating her was pretextual. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) ("[T]he fact that [the employer] did not follow its own internal procedures with respect to the [employment decision] also points to a discriminatory motivation."). Immediately upon learning that Miller may have applied to work at Esquire Deposition Solutions, LaMantia-Potter told Filishio that she intended to terminate

Miller if her employment with Esquire was verified, and Filishio agreed. Doc. 104 at ¶ 46. Verrant, LaMantia-Potter, Filishio, and Kelly decided to terminate Miller without knowing whether she in fact had accepted any assignments from Esquire or considering whether working for Esquire would create an actual or potential conflict of interest with her OCJ employment, even though the purpose of the secondary employment policy is to avoid conflicts of interest. *Id*. at ¶¶ 47-48, 55. Nor did they consider any less severe form of discipline, despite Miller's exceptional performance record, *id*. at ¶¶ 2-3, 49, or hold a pre-disciplinary meeting, which was mandatory under the CBA, *id*. at ¶¶ 50-51.

OCJ's decision to terminate Miller is even more suspect given the far less severe discipline imposed by Filishio and LaMantia-Potter on court reporters who committed comparable or more serious violations. *Id*. at ¶¶ 64, 66-74. Court reporters who falsified time sheets, harassed and physically assaulted coworkers, had multiple prior violations, falsely certified transcripts as accurate, and released confidential information were given only suspensions of up to 30 days and were sometimes transferred to another courthouse; none were terminated, and all were afforded pre-disciplinary meetings. *Id*. at ¶¶ 67-74. Although OCJ terminated one court reporter for not returning from leave, that happened only after the reporter was given multiple opportunities to return, afforded a pre-disciplinary meeting, and found to have abandoned his job. *Id*. at ¶ 66. This comparator evidence alone suffices to establish pretext on summary judgment. *See Coleman v. Donahoe*, 667 F.3d 835, 841, 852 (7th Cir. 2012) (holding that "comparators [who] (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct of comparable seriousness … are similar enough to permit a reasonable inference of discrimination," and that "evidence that a similarly situated employee received better treatment … [can] satisfy the plaintiff's burden to show that the

employer's legitimate nondiscriminatory reason for its action was pretextual[]") (internal quotation marks omitted).

Contrary to OCJ's submission, that Miller is "the only employee [who] violated the rule against secondary court reporting employment" does not mean that she cannot identify a suitable comparator. Doc. 102 at 11-13. "Comparators must have engaged in similar—not identical—conduct to qualify as similarly situated," and "[t]o determine whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Coleman*, 667 F.3d at 850-51 (internal quotation marks omitted). That standard is met here, or at least a reasonable jury could so conclude.

The close timing between Miller's sexual harassment complaint and her termination further suggests that she was terminated because of her complaint, not because of any violation of the secondary employment rule. *See id*. at 861 ("[W]hen there is corroborating evidence of retaliatory motive … an interval of a few weeks or even months [between the employee's protected activity and an adverse employment action] may provide probative evidence of the required causal nexus."). OCJ's contention that the timing of Miller's firing cannot "indicate[] that the basis for her termination was a lie" because she "fails to provide any corroborating evidence of retaliatory motive" has no merit. Doc. 102 at 8. As discussed, Miller presents ample evidence that OCJ fired her in retaliation for filing a sexual harassment complaint.

Accordingly, Miller's Title VII retaliation claim survives summary judgment and will proceed to trial as well.

## II. ADA Claims

### A. Discrimination

The ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "To establish disability

discrimination, a plaintiff must prove that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012). An adverse employment action must be "'materially' adverse to be actionable," *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001), and includes "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities," *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013). To establish that an adverse employment action was taken "because of" the plaintiff's disability, the plaintiff must show that, "'but for' h[er] disability, [s]he would have been able to access the services or benefits desired." *A.H. by Holzmueller v. IHSA*, 881 F.3d 587, 593 (7th Cir. 2018).

Miller submits that OCJ fired her because of her PTSD, which her physician's statement on her FMLA leave request disclosed to OCJ. Doc. 91 at 25-26. OCJ counters that it had "no prior knowledge of [Miller's] disability" until she requested FMLA leave, that she was "fully qualified for her job without the accommodation she requested," and that she "cannot identify evidence from which a jury could conclude that her alleged disability was the cause of her termination" because she was fired for violating the secondary employment rule. Doc. 82 at 9-13; Doc. 102 at 14-15.

As to OCJ's first argument, Miller does not contend that OCJ discriminated against her based on her disability at any point before she requested FMLA leave. Accordingly, OCJ's lack of knowledge of her PTSD before she submitted her FMLA request is immaterial. OCJ's second argument fails because success on her discrimination claim does not require her to show that she

is unable to perform her job without an accommodation. *See Hoppe*, 692 F.3d at 838-39 ("To establish disability discrimination, a plaintiff must prove that … she is qualified to perform the essential functions of the job, either with *or without* a reasonable accommodation … .") (emphasis added).

As to OCJ's third argument, a reasonable jury could find that OCJ fired Miller because of her PTSD. Miller's PTSD symptoms of panic, tearfulness, inability to concentrate, and fear of sheriffs, Doc. 104 at ¶ 40, are akin to the "disruptive" behaviors that led Filishio, LaMantia-Potter, and Verrant to attempt to remove her from the Skokie courthouse. When Miller began shaking and crying uncontrollably after Cooperman walked through her courtroom on May 3, LaMantia-Potter considered it a "disruption" and "inappropriate in a courtroom setting." *Id*. at ¶¶ 28-29. When Miller became upset during her May 15 phone call with Filishio and LaMantia-Potter, Filishio concluded that Miller's reaction to the harassment was disruptive and told her, "You are disrupting my courthouse." *Id*. at ¶ 31. As noted, Filishio and LaMantia-Potter attempted to transfer Miller to Rolling Meadows, and when Miller refused, LaMantia-Potter warned her that it was "not appropriate to have outbursts in court." *Id*. at ¶ 34. And in response to the erroneous allegation that Miller delayed court proceedings after becoming upset when Cooperman again walked through her courtroom on May 17, LaMantia-Potter directed Miller's colleagues to send her written reports about Miller's behavior during the May 15 phone call, and Verrant, LaMantia-Potter, and Filishio discussed various ways to "remove" her from the office "effective the following day if these outbursts were going to continue," including by suspending her under the CBA. *Id*. at ¶¶ 35-39. That evidence suggests that Miller's termination was motivated by OCJ's desire to avoid having to deal with Miller's PTSD symptoms when she returned from leave.

Accordingly, Miller's ADA discrimination claim survives summary judgment and will proceed to trial.

**B.      Failure to Accommodate**

As noted, the ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Under the ADA, "discriminat[ion]" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." *Id*. § 12112(b)(5)(A). "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co*., 417 F.3d 789, 797 (7th Cir. 2005).

Miller submits that OCJ failed to accommodate her PTSD because it effectively denied her request for a three-month FMLA leave of absence, and gave her only two weeks of leave, by terminating her two weeks into her leave. Doc. 91 at 26. That claim fails because its essence is that OCJ fired her due to her PTSD. That claim is properly conceived as a discrimination claim (my employer fired me because of my disability), not a failure to accommodate claim (my employer failed to adjust my work environment, duties, or schedule to accommodate my disability). *See Green v. Nat'l Steel Corp., Midwest Div*., 197 F.3d 894, 897 (7th Cir. 1999) ("A claim for failure to accommodate is separate and distinct under the ADA from one of disparate treatment because of a disability."); *see also Riley v. City of Kokomo*, 909 F.3d 182, 189-90 (7th Cir. 2018) (holding that the plaintiff's failure to accommodate claim had not been exhausted

because her EEOC charge alleged only that she was terminated based on her disability after returning from FMLA leave).

Accordingly, OCJ is granted summary judgment on Miller's ADA failure to accommodate claim.

## Conclusion

OCJ's summary judgment motion is granted in part and denied in part. OCJ is granted summary judgment on Miller's ADA failure to accommodate claim. This case will proceed to trial on Miller's Title VII sex harassment and retaliation claims and her ADA discrimination claim.

March 11, 2022

_____
                    United States District Judge